Madam Clerk, will you please call the next case? 14-1607, People v. Bryan Church, 5-14-1608, People v. Jared Chase, 14-2138, People v. Grant, Betterment. Okay, I'd like for the attorneys to step up to the podium. I'd like for the attorneys to tell me who they represent, state their names, tell me who they represent, and approximately how long their argument will take. Let's start with the opponents. Good morning, counsel. Good morning, Your Honors. My name is Maria Harrigan. I'm one of the attorneys. I represent Mr. Church. Mr. Church? Yes, and I expect to take about maybe 12 minutes, 12, 13 minutes, reserve a little bit of time for rebuttal. Okay, very good. Good morning, counsel. Good morning. Amanda Ingram on behalf of Brent Betterly, and I will also take approximately 12 to 14 minutes with a few minutes for rebuttal. Very good. Good morning, Your Honor. My name is Heidi Lynn Lambros, and I represent Mr. Jared Chase, and I also plan on taking between 12 and 13 minutes, and would like to reserve a few minutes for rebuttal. Very good. Good morning, Your Honors. My name is Catherine A. Sherrill on behalf of... I need Lynn to get your way. My name is Catherine A. Sherrill on behalf of the people of the state of Illinois. Would you spell your last name? S-C-H-I-E-R-L, Sherrill. Sherrill. Yes. Okay, very good. And I will use all my time for anything this Court has questions on. All right, let me advise the parties as to how we're going to proceed. We're going to deal with the cases in order, Church, Betterly, and Chase. Yes, I take it that's the way you want to argue. So that the Court is clear, Ms. Sherrill, I want you to respond to Mr. Church's argument, Mr. Betterly's argument, and then Mr. Chase's argument, okay? I'd like to advise the appellants, please try on those two issues that you have in common not to repeat those arguments. It would be very helpful. But you've divided the time. I'm going to let Ms. Harrigan proceed with the argument for Mr. Church. Yes. Okay. One other thing. I've been asked to advise you that the mics don't amplify. You've got to speak up. Okay. Your Honors, may it please the Court, this morning I will be focusing on the reasonable doubt argument raised in the defendant's briefs. I understand that the defendants were accountable for each other's actions, but I will be focusing more on Mr. Church. If there's any specific questions where the evidence differs, my co-counsel will take care of that with their clients. On the surface here, due to the numerous terrorism counts charged of which the defendants were acquitted and the hours of recordings made by the undercover officers, this record contains a massive quantity of information for the reader and the listener. However, the actual legal issue for this Court when deciding whether the State met its burden of proof is very narrow. The issue boils down to whether the prosecution proved beyond a reasonable doubt that the defendants had the intent to commit the offense of arson, which is defined as conscious objective. That's how it's defined in the statute, when the Molotov cocktails were constructed with the assistance and encouragement of these undercover officers. The State claims it proved the defendants' May 16th intent to commit arson based on their political rhetoric and conversations between May 1st and May 15th, most of which were recorded. Well, let's talk about Mr. Church for a second. May 15th, I think it is, he goes to the gas station with an empty milk carton and says, I want to pump some gas in this milk carton for my lawnmower. And the attendant says, that's not a legal container. How is that not incredibly strong evidence of his intent? The intent has to be not just to build the devices. The intent, that is a separate offense. It's an unlawful use of a weapon offense that the State actually dismissed that charge prior to trial and took on the burden of proving the intent to use them to damage real property or personal property over $150. The cases that you cite on that issue involve charges of attempted arson. And so when someone is charged with attempted arson, you have to prove the substantial step. You have to catch them pouring gas around the foundation of the house. Here it's possession with intent to commit arson. And the State's evidence was Molotov cocktails are used to commit arson. They have no other purpose. And you have your client, Mr. Church, going to a gas station with an empty milk jug trying to purchase the gas. What else do they have to prove? They have to prove their intent to use them not just by their construction. Again, that is a separate offense. An unlawful use of a weapon offense is a possession offense. Intent, presumably because it's a separate law and a higher class felony, requires more than simply making them. You have all these recorded statements where all of them are talking about the havoc they're going to cause. Again, Your Honors, most of those statements were armchair bravado, blustering in the context of going to protests, attending occupied protests. Isn't that what was argued to the jury? Isn't that the argument that all of the defendants made to the jury? These were people who couldn't shoot straight. They were so blind drunk and on drugs, and they were just talking. Yes, that was argued to the jury. But the inferences, alleged inferences made to get to intent were based strictly on speculation here. The intent is to go to something very specific. Using these devices to damage real property or personal property of a value of more than $150. What inference do we draw when somebody goes to a gas station for gas other than he's going to do something? Is it based on all the other information we have? Well, what they did, first of all, the gas that was purchased the next day, they did build the devices. But you also have to show an intent to use them in a specific way. And that is what we're arguing was not shown here. So all of the discussions about how they were going to use these Molotov cocktails, we simply ignore? Well, first of all, many of their discussions, they talked about using a lot of other weapons that they had with them. They never used them. They had them with them the whole time. They went to protests. They were peaceful protests. They acted peacefully. There were protests about the closing of mental health clinics, protests about the Iraqi occupation, and other such things that were going on at the time. They never used any of these other weapons. A lot of the conversations when they talked about buildings or structure of real property involved things like shooting slingshots through this chase bake window and completely fanciful thoughts of young people that are participating in a protest. My client is only 19 years old. He came up here from Florida to participate in this movement. And in all the excitement, a lot of things were said. But as conceded by the state, by Chico's testimony, there was never any actual plan. And on top of that, many times during the course of the early May conversations and on May 16th, the notion of building these devices was brought up by the undercover officers. And then the conversations would drift to something else, and they'd bring it up again. My client specifically said at one point that he is not into property damage. And they talked about being peaceful protesters and wanting to engage the police verbally. They were most concerned about defending themselves. They did de-escalation techniques. They thought that they would be pursued by aggressive police officers in protest situations. That's what they were training for. There was never any intent to use these under the statute, the definition of intent, a conscious objective. So is your position that your client should have been granted a directed verdict at the end of the state's case because no reasonable trier of fact could have found that they possessed these devices with the intent to commit arson? That is my position before this Court. That is what we are appealing, that no reasonable trier of fact could have found the specific intent in this statute. They were acquitted of all the charges about rioting involved in terrorism charges. They were acquitted of all those charges. The state could have charged them with a UW count. They dismissed that charge. They chose, they accepted the higher burden of proving intent. And they just did not do that here. The security soon even after the construction of these devices, they lost all interest in them. Church wanted to go to sleep. Chase wanted more beer. Church and Bailey went to pick up another friend. This does not explain any conscious objective to do anything with these devices. The state also talks about the fact that NATO was for days in the future. Again, there was no, the only person that brought up using these at NATO on that Friday night was Chico. And there was no response to that, to what she said. They didn't even want to go out and test them in the quarry, which wouldn't have been arson anyway, because that is not under the statutory definition. So is our position that none of these defendants had the conscious objective or intent to use these devices? None of them had the intent to commit arson when these devices were built. For his part, 19-year-old Mr. Church blustered and gloated about unrealistic ideas for protests. And despite any type of violence, he spent a great deal of time drinking and using drugs or wanting to. When he did attend protests, he was peaceful, they were peaceful. He took no part in the Molotov construction and abandoned them after the construction rather than want to test them. Under these circumstances, all the state showed was that these young men came into the city to drink, get high, talk big and protest. They had no intention to commit arson, nor did they have knowledge that anyone else so intended. Therefore, we ask that their convictions be reversed. If Your Honors have no further questions. Thank you. Thank you. Yes, Your Honor. Yes, the State. Yes. Good morning, Your Honors. Counsel and Assistant State's Attorney Sherrill, may it please the Court. You've got to speak up, Counsel. Okay. Your Honors, the jury convicted defendants of possession of these Molotov cocktails with intent or knowledge that another intended to use them to commit arson. It also acquitted them of terrorism charges, but it found them guilty of the lesser-included offense of mob action. We ask this Court to affirm these convictions for a number of reasons. This Court correctly notices or considers all of the evidence together that shows the defendants' intent. The Counsel argues that there was insufficient evidence that defendants intended to use them to commit arson. That's emphatically not true. First of all, defendants, when you consider all of the direct and circumstantial evidence as a whole, it is more than sufficient to establish defendants' intent to use these Molotovs to commit arson. Defendants had a plan, contrary to what Counsel say up here and in their briefs. They had all the parts of their plan. They had the how, which was throwing Molotovs at the officers behind their weaponized shield. They had the who, the officers, and all of their equipment, which goes to their claim and refutes it that this was not an intent to commit arson. They had the where, and that was at NATO. And they had the what, the Molotovs that they made. Just because they didn't flesh out all the minutia of the plan and the specific details of their plan to commit these crimes during NATO doesn't mean that they did not have a concrete plan. Well, where in the record is the who, what, where that you just described? At least one of the conspirators, and their statements are all admissible against each other, said, okay, we've made our Molotov cocktails. The NATO summit is in four days. Let's put them in the trunk of Church's car and we'll use them at summit. Yes. Where is that? That's in, it's in all the circumstantial evidence of their three weeks of conversation in the lead-up to the actual making of the Molotov cocktails. Contrary to them being punished for future crimes or for political ideology or protective First Amendment activities, these defendants indicated circumstantially throughout their conversations with these officers that they intended to throw Molotovs, to throw different types of bombs at officers to injure them during NATO and to provoke a riot on the world stage. The evidence is replete with their Facebook posts, their conversations. Church, in fact, Church specifically posted that it would be easy to start a riot where there were thousands of angry people and he wanted to, quote, be on the front line and he was willing to, quote, fight to change things and that his fight might end up getting him shot and killed. That's the mob action and I actually don't see the defendants arguing against that conviction. Then he also said that police weren't going to know what hit them, that the city did not know what it was in for and that after NATO the city would never be the same. He also said that, he asked his co-defendants and the officers, the undercovers, have they ever seen a car burn and would they like to see an officer on fire. And that was after the Molotovs were made. So the idea that they abandoned or didn't, he abandoned or any of the defendants abandoned their intent to use, their concurrent intent to use them at the time they were made, that they had at the time they made the Molotovs, the Ovid Act, the Actus Reis, is not true. Just because their concurrent intent was to use it during the protest, the NATO protest, doesn't mean they were punished for future conduct or for any protectable First Amendment activities. The defendants created the Molotovs and that's certainly not a science experiment. And when they completed the crime, that's when they were arrested. When they did the Actus Reis. Now their conversations throughout the time with the officers that were recorded and that were the actual admitted conversations, indicate clearly that they were formulating this plan over the three week period. The conversations that Church and Chase participated in in the park, there were extensive discussions of bombs and throwing things and bombs at officers during NATO. There were flash bombs, there were sock bombs. Church built a mortar and practiced using it and explained how to make it to Officer Chico. He also, at the same time he and Chase discussed the making of various kinds of Molotovs and they said they wanted to burn officers to light their clothes on fire. And Chase was pretty obsessed with Molotovs and so none of the officers weren't the ones who brought it up or who manipulated them. Isn't Chase the one who said I've never made one before? No, Church said that. Okay. Church said that. But in the park during the May 4th conversations, which is what Officer Ugin referred to on the night of the 16th when he said Molotovs, he was referring to Chase. Chase's discussion when he said all these things about Molotovs, he wanted to make them with M-80s, he wanted to try them and make them with fuel, he wanted to throw them at officers from behind the shield, he wanted to carry them in his coat. If an officer tried to arrest him, he would light them on fire. And of course all these statements are attributable to all the defendants, but Church and Chase were in agreement that during these conversations that that's what they were going to do. Then on the porch on the night they made the Molotovs, the defendants all talked about different kinds of bombs and they all talked about throwing these bombs at officers and what would be the effect of these various types of bombs. Church talked about the potassium permanganate bomb and Chase talked about making the napalm bomb and Betterly talked about making the acid bomb and throwing it at police stations and their equipment in the past. Now all of these statements, all of these things have in common is the fact that they were designed to injure and burn officers. Was there surveillance of potential sites by the defendants? Yes, Church did a lot here, he recruited locals of like mind, people who disliked police as much as him and who were interested in attacking targets in the city, committing crimes of violence. He traveled around, his car was tracked going past the Federal Reserve, the Board of Trade, various banks and police stations. There's ample evidence that he did in fact surveil these targets. He actually described the layout of two police stations to the UCs. He even broke the geofence that the police had put around Obama's campaign headquarters. Then Church also, he brought an arsenal of weapons with him, including a compound bow, a weapon specifically designed to penetrate police's protective kevlar vests. He concealed them, he concealed them in a guitar case at first and he concealed them in his car, in the trunk of his car when police were in the area and it was hot. Church and Chase showed the officers this four person shield that they built. It wasn't a crude blockade to protect against police force like defendants claim, it was a weaponized shield with concealed and protruding screws. The screws protruded, what was it, three quarters of an inch? Yes. So how could those, how could the screws hurt anybody? All of these arguments that defendants make before this court were extensively made to the jury. The jury heard and rejected all of the arguments that defendants make. They are the body responsible for weighing the evidence and they weighed the evidence and they determined the credibility of the witnesses and they drew a very reasonable inference that defendants intended to commit arson with the molotovs that they made. And the evidence in this case fully supports that determination. And Chase, yes, he went to get gas, lying that it was for his lawnmower the day before. So the... Is it Chase or Church? I mean Church, I'm sorry. I have three guys, so sometimes... That's okay. But... And he... Okay. When the molotovs were being made, he actively participated in the making of them. First, he helped retrieve the bottles, he left his fingerprint on one of them. When one of the coal resins appeared on the porch, he hid them. He concealed their activities. And he... He lent his knife to be used to cut the wicks and he offered to store them and conceal them in his trunk and he gave Chase the keys to do so. The only reason that the defendants stored or concealed these molotovs was because they intended to use them. And they made clear through their conversations, even the conversations that immediately preceded the making of these molotovs, on the porch, throwing bombs at cops, discussion of different kinds of... If you throw a potassium permanganate bomb at a cop, do you know what happens? It's real fun and you know what happens? It burns through the officer's skin and clothes. It goes BAM and acid shoots everywhere. And the other defendants too when we talked about their bombs. And Betterly said, it's going to take serious escalation on our part to provoke these officers. And we have to be the ones to draw first blood. And when... Then he said, and it's not... Serious escalation is not what I mean by throwing a brick in an officer's face. Betterly meant something much more. He meant throwing something that went BOOM. So all of the evidence in this case that the jury heard, you have to take it as a whole. You can't parse it out the way defendants try to do, piecemeal, isolated fashion, day by day. And when you look at all of it together, the jury's verdicts were reasonable and they're fully supported by evidence in this case. In light of that, this court really must... If you view this evidence in the light most favorable to the prosecution, this court should affirm the jury's verdicts. Thank you, Ms. Sherrill. Ms. Harrigan, do you have any rebuttal? First, the state talks about some concerted plan that had taken place over these two weeks before the 16th. The state makes it sound more organized. It was really disjointed. Occasionally, one of the defendants would fantasize or talk about some kind of crime and then the topic always switched to, what are we going to do tonight? Let's go to Cinco de Mayo. Where's this next protest? It was not this concerted plan that ended up on this night where they got together and decided that, yes, we're going to make these devices and then we're going to throw them at NATO. It was not nearly that organized at all. Also, contrary to what the state said, the construction of the Molotovs that night was encouraged by the undercover officers. The material for the risk was provided by... But that's really, you know, that was one of the arguments except the defendants expressly disavowed any entrapment defense. We're not arguing entrapment.  But that's a jury question. We're arguing that under the standard on appeal that the jury got it wrong, that this inference could not have been made based on the evidence that was presented at trial. They didn't talk about using them at NATO during the construction of them. They abandoned them after the devices were constructed. What they were convicted of has a very specific intent, to use a certain device to damage property by fire. A lot of the evidence and conversations that the state is talking about went to the other charges of which these defendants were acquitted, starting riots in the city at protests. This has nothing to do with arson. As far as the car being trapped, we have no... the police have absolutely no idea who was driving that car at the time. Church gave his keys to other people. Yeah, the car drove by Obama's headquarters. We don't know who... the defendants themselves were not surveilled, and so the police couldn't have been that worried about what they were doing if the defendants were not being watched. They saw the undercover officers a few hours, a few days, during that two-week period before the 16th. Again, going back to the May 15th gas station protest by my client, that witness, even though he said he was completely unbelievable, he didn't report this for months, and he had this whole other life going on on the Reddit site, so he was actually more into the attention he was going to be getting for this when this story got big. But then again, that's an argument you made to the jury, right? Yeah, but I'm making... we're making an argument here that the jury in the late and most favorable state this evidence didn't prove our client's guilty, and therefore your honors have to consider some of this same evidence, even though I understand what the standard is that you're operating under. Again, during the time of the construction, the state mentions the things that the defendants said about certain different bombs. Immediately after my client talked about that one type of explosive device, and by the way, this was also even before the gas was purchased, so this was just idle conversation at the time, my client just took himself out of this situation. He said, no, I don't really know how to do this. I've never made one before, and really there was no plan to make any bombs to do anything to throw at people at that time. And finally, as far as the... Excuse me one second, your honors. Yes, he said they were nonviolent and believed in peaceful protest after that, after he had said that one conversation. Mr. Betterly, there's no indication that this incident he talks about even happened. So again, these are people just talking and fantasizing that this does not amount to intent, specific intent, conscious objective to use these devices to commit arson. Do your honors have no further questions? No. And you're standing on your brief with respect to the other issues, and you're asking us to reverse the defendant's conviction, correct? Yes. Thank you very much, Ms. Harrigan. Thank you. Ms. Ingram. Good morning, your honors. Again, my name is Amanda Ingram, and I represent Brent Betterly. I would like to focus my time this morning on the improper introduction of other crimes evidence, and then briefly address a few points regarding reasonable doubt that specifically relate to Mr. Betterly. It is block letter law in Illinois that evidence of crimes for which a defendant is not on trial is generally inadmissible. As the state concedes in its brief before it may introduce evidence of other crimes, it must first show by more than a mere suspicion that a crime actually took place and that the defendant participated in its commission. In this case, the portion of the recording during which Betterly claimed to have thrown acid bombs at a Florida sheriff's station was other crimes evidence that fell short of the standard required for admission. First, there was no evidence that this other crime ever happened. Aside from Betterly's statement in the recording, the state provided zero evidence that this event ever occurred. There's nothing in the record, no report from the Broward County Sheriff's Department, no reports from local media, no photographs, no witnesses to damage to any damage that such a bombing would have caused. It does not appear from the record that Mr. Betterly or anyone else was ever charged in connection with such an incident. Citing to you in the interest of LF, a second district case from 1983, the state argues that Betterly's admission alone was sufficient to show that this crime occurred. In LF, the minor defendant was accused of a residential burglary in 1982. In a statement, the minor admitted to burglarizing the exact same home two years prior in 1980. The minor knew the layout of the home and was aware that the owner kept cash and valuables in a hall closet, which explained how he knew where to look. The court found that this statement showed the minor's motive and intent and briefly noted that the admission to the prior burglary was sufficient evidence of that other crime. So other than NRA LF's age and the fact that it hasn't been cited, why do you say that it's not good law? I would encourage this court to look to more recent authorities, such as People v. Fingold, which establishes that in order for another crime to be admitted, there has to be something, it doesn't have to be the standard of a reasonable doubt, but it does have to be more than a mere suspicion. And LF, in the case we have here, if a defendant makes a claim such as this, that he's committed another crime, that might raise a mere suspicion at best, but it is not more than a mere suspicion sufficient under Fingold to warrant admission in a case like this. Why is it just mere suspicion? I mean, it's a little odd to say that when somebody admits to a criminal act, that that's just a mere suspicion that they've done it. It is, in this case, absolutely a mere suspicion that this crime actually happened, because, again, there's absolutely nothing aside from this statement. And, again, you have to look at, too, the context in which this statement was made, where this group had been drinking and very likely doing drugs for a great deal of that evening. They were talking about protest. They're bragging. They're making statements. We have no idea if this happened or not. And, again, if the state wanted to put it in and have the opportunity to make an offer of proof and say, yes, this did actually happen, and here's a local media report or here's a – I can only imagine what objection would have been raised if the state came forward with evidence that at some point in time the Broward County Sheriff's Office was, in fact, attacked, not connected to Mr. Betterly. He would be screaming bloody murder about that evidence, right? Yes. Presumably, if the state had evidence that somebody unconnected to these defendants did this. In your view, the state has to come forward when a person against whom the statement is made has admitted to participating in criminal conduct. The state has to either prove that they were arrested, that they were convicted, that media reports connected them to the offense. I mean, is that the position you're taking? No. The state has to prove that the crime actually occurred. How the state makes that proof is up to the state. But in this case, the state showed nothing to show that this ever actually happened. Absolutely nothing beyond his mere statement that's on this recording. So, no. All we have here is the mere suspicion, which under ThingVold, which is the law of the state of Illinois, says that's not enough. And LF is particularly, LF is unpersuasive on this issue because, again, it's not just that it's an older case or that it's from a different district. It's not just that. But it's that in light of the more recent authority, LF just doesn't make sense anymore. When you're required to have, under ThingVold, more than a mere suspicion, that has to mean something. And if it just means, well, we can put in anything we want, so long as the defendant says, then that removes the power that ThingVold gives us. It essentially gives the state the benefit of using other crimes' evidence without the burden of having to show that it actually happened and that the defendant participated in it. To me, mere suspicion is if the state came in with a statement from somebody else saying, I think Brett Betterly was involved in a firebomb at the Broward County Sheriff's Office. That would be mere suspicion. But when the perpetrator himself says, this is what I did, it seems like more than mere suspicion to me. Respectfully, Your Honor, I disagree. I think we have a situation here where we've got these young men who are drinking, they're doing drugs, they're making a lot of big talk. And again, if he had actually thrown acid bombs at a sheriff's station, there would be some evidence that that ever happened. And there's none of that here. There's absolutely zero evidence that this ever, that this is an event that took place. And again, we don't even have a time frame. At least in El Roth, the minor provided a time frame for when he had burglarized this exact same other home. But this is just at some point in time previously, we have no idea when, he claims to have done this, and yet, there's no report from the Broward County Sheriff's Office, there's no photographs, there's no witnesses, there's absolutely nothing. And under Fingold, that is insufficient to get this evidence against Mr. Betterly. If I may now briefly address reasonable doubt as it pertains to Mr. Betterly. As my co-counsel argued, the State failed to prove beyond a reasonable doubt that Mr. Betterly and the others possessed the devices with the intent to commit arson. And the evidence against Mr. Betterly in particular was even less convincing. So the use of the improper crimes evidence against him may have took the scales. In the weeks prior to May 16th, Betterly was not on those recordings at all. He didn't say or do anything during those period of two weeks that indicated any intent to commit arson. On the night that the devices were made, Betterly didn't join the group to get bottles. Betterly didn't join the group when they went to get gas. When Eugen returned with the bottles, he did ask Betterly how to construct them, which is when Betterly did give instructions on his opinion on how to construct these devices. But again, this is in response to a direct question. Notably, at one point, Betterly came out onto the porch and said it smelled like straight gas in the house. In order for him to have made this realization, he had to have been inside the house and not on the porch to come back and make this report. In short, none of Betterly's words or actions on the night of May 16th proved beyond a reasonable doubt that he formed an intent, a conscious objective, to use Molotov cocktails to commit arson. The trial court notably admitted that the evidence against Mr. Betterly was weak, saying that it was concerned that his comments showed only an intent to be a rowdy protester. The trial court's comments were apt, and I would encourage this court to consider those comments as well. The evidence against Mr. Betterly was the weakest of the three, and this court should reverse his conviction outright. If there are no further questions, I'd ask this court to find that the state failed to prove its case against Mr. Betterly or alternatively remand for a new trial, and I'll save my remaining time for rebuttal. Thank you, Ms. Ingram. Thank you. Ms. Sherrill. As Justice Mason has pointed out, LF is good law, and it's directly on point here. Not only did Betterly say that he made and threw the acid bombs in the past at police stations and police vehicles, it's also a party admission. In our system, a party admission is much more than something less than mere suspicion. The claims that the replete citations and arguments with respect to these defendants for drinking and doing drugs, those are all largely based on the unadmitted recorded conversations, which is not evidence in this case. And the people ask this court to bear that in mind when considering this case. Moreover, Your Honors, the fact that these defendants drank beer, smoked cannabis, and were less than criminal masterminds, doesn't negate their intent or make them incapable of committing these crimes. Betterly's, not only did Betterly say that he made and threw these acid bombs in Broward County, he also described how he made the bombs, and that lends credence to his claim that he made the bombs. And he's also actively making, coaching, supervising, and instructing Chase and the other defendants on how to make Molotovs, which he's the only one who actually knew at the time how to make them. And he told them the only way to make a proper Molotov is to use gas. He demonstrated how to cut the wicks. He demonstrated how to soak them inside the bottles. He corrected Chase when he was going to soak them outside the bottles, and he demonstrated how far to fill them. So all of these circumstances lend credence to his claim, and it's much more than mere suspicion. And LF is a controlling case. His statement and party opponent admission is more than sufficient for that statement to be properly admitted by the child court, and its admission was not an abuse of discretion. It was relevant to the state of mind and to the intent that was in dispute. And with respect to the reasonable doubt, Your Honors, first of all, the claim that that battery was inside the house isn't true. It's not borne out by the testimony in the record. The officers testified that he was on the porch the whole time, that he really went inside the doorway for a couple of seconds and said, it smells like gas in here. And he closed the door, concealing what they were doing and concealing the smell of gas. So if he was participating in instructing how to make the Molotovs, would it make any difference if he went inside for 10 minutes? That's exactly what I was going to get to next. He still is liable for what they did. He was the wing leader. He organized this whole trip. He introduced Church and Chase. He made the arrangements to come to NATO. He wanted to start a riot. And he's the first one who talked about throwing Molotovs at the cops and making a Captain America shield. Betterly is intricately involved in the events and circumstances here. The trial court in the directed verdict denied his notion for directed verdict. And the jury found that he was guilty beyond a reasonable doubt. And the evidence in this case fully supports that jury's verdict. And the pro-verdict, let's see. Even without the acid bomb statement, there's overwhelming evidence, some of which I just cited. A lot of it is in our briefs that he was guilty beyond a reasonable doubt of the crimes he was convicted of. In addition, your honors, the jury demonstrated its impartiality and neutrality. It didn't convict Betterland Propensity on inadmissible evidence. It held the state to its burden. It parsed out the evidence and it acquitted defendants of the terrorism charges, convicting them of the possession charges instead. This court should reject his evidentiary challenge. Anything further? That's fine. Honestly, there's a lot. Thank you. Ms. Ingram? Hello again, your honors. I just have a few points in response. First of all, to the state's attorney's argument that this was an admission by a party opponent. An admission against any defendant can be admissible as substantive evidence to show his guilt of the offense charged. This admission, for what it's worth, doesn't show his guilt of the offense charged. Again, at most it shows a mere suspicion that he, at one point in prior time, threw acid bombs at a Broward County Sheriff's Station. Doesn't his statement about what he did in the past, combined with his instruction to the other defendants about how to make Molotovs, more than mere suspicion? No, it isn't. For one thing, this acid bomb statement took place at least 20 minutes before they even got the bottles off the top of the refrigerator. It took place about an hour before the undercover officer offered to purchase gas for the group to build these things. And over approximately an hour and a half before the construction actually began. So you cannot conflate all of these statements and all of these actions that occurred and pretend that they occurred within a span of five minutes when they didn't. It actually occurred over the course of that evening. So when these acid bomb statements were made, how can it be said to have encouraged this activity where the idea hadn't even been hatched for at least an hour? My question is a little different. You're saying that his admission to throwing an acid bomb in the past doesn't rise above the level of mere suspicion. But when you combine it with the evidence in the case that he's instructing the others how to make Molotovs, and he talks about how to make acid bombs, isn't that more than mere suspicion? It's not more than mere suspicion. Because again, in this case, those instructions that he gave almost every single time were in direct response to a question by an undercover officer. This was not coming from him. He was not volunteering this out of the thin blue air. This was an undercover officer who was specifically requesting instructions on how to create these devices, and Betterly is responding. But again, Betterly did not go with them. Betterly didn't get the bottles with them. He did not go with them to get the gas. And I strongly disagree with the State's Attorney's suggestion that he was on the porch the entire time. Even the officers admitted that he was at least in and out on the porch and in the house. And the recording bears this out, because he is silent for spans of minutes. At one point, he's silent on the recording for at least four minutes. There's another portion on the recording where he's silent. There's absolutely no word from Mr. Betterly for a stretch of 13 minutes. And this is even when they're pouring the gas on the porch, and everyone else is like, oh, that smell is so strong, and they're talking about how strong the smell of the gas is. Well, guess what? Mr. Betterly isn't saying a word, which strongly disputes the State's portrayal of him as being out on the porch for every single minute. And again, the State's portrayal of Mr. Betterly as the ringleader is absurd. How can he be the ringleader if he's not even on any of the recordings for the first two weeks that this is all going on? He's not on the recording on May 4th, 5th, 6th, 8th, 10th, 12th, 14th. He doesn't even show up until the very end. It's completely implausible that he was somehow the ringleader of this group, particularly when you have so much of the events that night were being encouraged and directed by undercover officers, and certainly not by Mr. Betterly in any form or fashion. And while I agree that the jury did hear these arguments, and the jury has a role, this Court has a role, too, to review that evidence, and if it does not meet up to the standards established by this State, it has a duty to overturn these convictions. Anything further? No, thank you, Your Honor. Thank you, Ms. Ingram. Ms. Lambros. Good morning, Your Honors. My name is Heidi Lynn Lambros, and I represent the final defendant, Jared Chase. I'd like to focus my arguments today on the second issue of Mr. Chase's brief about his unfitness for trial, and I would like to address briefly a couple of arguments related to Mr. Chase's arguments regarding reasonable doubt. But I'd be happy to answer questions about the other two issues in the brief. Otherwise, I will rest on the arguments pertaining to the brief. In September 2013, Mr. Chase was diagnosed with Huntington's disease, or HD, which is a fatal neurodegenerative disorder characterized by worsening motor, cognitive, behavioral, and psychiatric symptoms. It's extremely rare, and patients with HD suffer from attention problems, executive dysfunction. They can't make plans. They can't have severe memory issues. They become irritable. They suffer from dementia, and they have difficulty controlling their outbursts and become psychotic and suffer from hallucinations. But the symptoms of Huntington's don't emerge full-blown. I mean, somebody with Huntington's can be diagnosed on a genetic test, and it's not like all of the effects of the disease, as you just mentioned. All of a sudden, one day they're fine, and the next they're hallucinating. Well, we know from the record that Mr. Chase had been suffering from some symptoms of HD. He had been falling out of bed in 2012. Several people on the recordings marked about him shaking and having some motor skill issues. And because Mr. Chase's father had died, and because of Mr. Chase's family, they suspected that he had been suffering from some symptoms for at least a couple of years. In fact, at sentencing, his neurologist said that they suspected that he had been suffering symptoms for about five years. Now, we don't know much about HD, and we don't know much about how it happens and the interplay between it and the criminal justice system, which makes this an extremely unusual case for fitness. As we argued, not just because of the HD, but some other factors that came into play, is the reason why the trial court found him that there was a bona fide data to his fitness before the medical reports came by. But that's a reading of the record that maybe is open to interpretation, because the court expressed concern about his loss of weight and his appearance. His lawyer expressed some concern about his physical ability to endure the trial. And so the court orders a BCX. I don't see that necessarily as the court saying, I agree there's a bona fide doubt as to his fitness. So the court did not use the magic words of bona fide doubt, but counsel used the magic words of bona fide doubt to which the court agreed. So the court was the first person to say, I think there's a problem here. And that's because Mr. Chase picked up another case, which was throwing some urine and some feces, which is a common symptom of mental illness involved in an incarceration situation. And then they came back on the record. And the defense attorney wanted to make clear what was being asked. He filed a motion for not just a BCX going through SOMAC and going through traditional routes, but they wanted Dr. Shannon to come in as a neurologist and have a separate physical psychomotor evaluation, which is what counsel was asking for. And counsel said on the record, just to be clear, are you saying that your bona fide doubt comes from these other proceedings, meaning the other case, and not from the HD? To which the judge, being concerned, said, no, my questions are concerned come from many issues. The other case, his wasting away and his changing of the skull, which was never properly explained, as well as the HD, and wanting to make sure that this defendant was fit for trial. Understanding this extremely complicated defense, this is going to be a weeks-long trial. He's going to have to sit and listen and be able to participate. When counsel said, okay, we're in agreement that there is a bona fide doubt about his ability to withstand trial. We are saying that our bona fide doubt is your bona fide doubt, counsel, to our court, which court never objected to. In fact, the state didn't pipe up and say, no, I think we're not even to the bona fide doubt stage. We're pre-that. Everyone seemed to be in agreement. In fact, counsel mentions three times about a fitness hearing. So the rest of the conversations the state brings up is counsel wants a psychological profile and a physical profile. Because HD affects both, not just the motor skills and the cognition, but they go hand in hand. So that's what counsel was trying to get through and what the court granted, which is kind of exceptional to grant a private expert to come in and review. So what we have following that is we have these two medical reports coming back. One from Dr. McCarney at CIRMAC, who's not an expert in HD, who found that he was fit with Haldol, was prescribing him an antipsychotic drug. And then we have Dr. Shannon, a neurologist who doesn't have any experience with forensic psychiatry, saying that, yes, I believe he's fit, he understands the people, places in the courtroom, but he has those limitations to his attention and his cognition, that he needs special concerns to be done. So not only do we have the waste in the way that the court mentioned, we have the HD, we have his other crime of, you know, throwing urine and that type of stuff. We also have Dr. Shannon saying, obviously not understanding what fitness truly means, that he's going to have cognition issues. He's not going to be able to understand these. And we have a prescription of Haldol, an antipsychotic drug. So those five things combined. I suggest I read this record as that everyone in the room knew that there was a bona fide doubt of fitness. And everyone was concerned about making sure he could sit through a monster trial. And that monster trial took place just a couple of weeks later. And that the magic words weren't said, and the court, when he got these two, you know, fitness reports, said, I don't find a bona fide doubt. And I think that was an error. I think there was already a bona fide doubt found, if not by a specific language of what the court agreed to, but certainly by the information that he had. A hearing should have been done to figure out exactly what nobody knows. I don't know. I mean, there's very limited internet things about what happened in HD. Can this person who, when there's signs of dementia, who can't remember things, can they actually participate in their defense? And I think the state's example of him showing that he had the cognition. So he comes in their brief, I think, as an apt description of HD. Obviously, his very, very, very well-prepared lawyers told him, we're going to be asking for an instruction in a lesser-included offense. Undoubtedly, they did that. Prepped him for that. Prepped him to say, yes, I want the misdemeanor. I want the jury to hear about the misdemeanor. But when Mr. Chase was asked to speak, he said no. Well, what else do you have to go on, though? I mean, you say Huntington's disease, which is a terrible disease. It has all these effects. He's evaluated by exactly the professionals that he requests. They all come back with similar reports regarding fitness-to-stand trial and sanity at the time of the offense. And he does participate on the record in an unremarkable fashion in determining whether he wants a joint trial, whether he wants a lesser-included offense instruction. So aren't you asking us to read between the lines? I think the lines are there. I think that it's just more than HD. I think that Dr. Shannon's finding of fitness was not, it was, the bold says fit-to-stand trial. But underneath the bold, her words said, he's going to have cognition issues and attention span issues. And he's going to need to take frequent breaks and walk around. I'm not sure that the court. Many of the defendants require that accommodation, and they're not unfit. And they all have fitness hearings. I understand that. And there's really no case in Illinois that addresses Huntington's disease as far as trials go. And because of that, because of the rareness and the unusualness, a hearing should have been held by the court. And the court was concerned to make sure that this progressive disease, in fact, the judge said, I don't know if he's at the stage where he has dementia, acknowledging that he might be at the stage where he has dementia, which means if my lawyer tells me one thing about a Jew instruction one day and I come into court the next day and I don't remember, that's the danger. Many decisions had to be made by this young man. And we can't be confident that they were made with him actually knowing what was going on. And a hearing, which could have been a joint hearing, a short hearing, I mean, calling in these experts, saying, what does he need? And the handle, that's extremely, I mean, it was just prescribed. And is he fit with that at all? I mean, is this something that, how is that going to affect his judgment? And why was an antipsychotic given him by CERNAC Health Services? I think that the judge actually ordered and found a bona fide doubt. I think that form over substance should not rule here. His agreement with counsel three times on the record that yes, and when counsel is asking for a hearing, a fitness hearing, I believe that that shows there was a bona fide doubt. But if not, this record does bear out that there should have been a hearing to question his fitness. And even at sentencing, we find out the tragedy and how he's going downhill, even from the trial into sentencing parts. And although this is an extraordinary disease, sometimes in these circumstances it takes something as not extraordinary as a hearing, as a half a day, to make sure that this extremely complicated trial, that he understood every single thing that was possibly happening. These young men were on trial for their life. I mean, the terror was in charge, bore out, and essentially a natural life sentence if they ended up getting sentenced to that. So the judge should have been, as he was in the beginning, extra cautious. And because of that, as the state concedes, it's a social error. We have, you know, that there was a bona fide doubt, and he should have had a full and fair fitness hearing. I'd just like to briefly address, as the representative of the clients who was the creator of the Molotov's glass bottles, that's everything that my prior counsel said in esteem. But I just wanted to point out that we do not deny that the putting in the gas in the bottles and making these things was a crime, and it was wrong. And that's kind of what the state thinks that we're avoiding, and we're not avoiding that. And they were convicted of a crime that had to do with that, and that, I guess, would be the mob action. And they were charged with doing that, which would have been the unlawful possession of a weapon, unlawful use of a weapon. But the state still had to prove that they were going to use them, and they were going to use them in the manner that was charged. The state did charge these young men with possession of an incendiary device with the intent to commit aggravated battery of a police officer, meaning you built these Molotov's for the purpose of hurting police officers. They dropped that charge. What they were charged with is possessing the Molotov's, plus the intent to either throw them at real property, which the state doesn't even really attempt to show what that would have been, or personal property, which is personal property over $150. And to be strict about it, the state's offer on that, that one fact, that that one police officer spent $600 on his personal vest, that police officer that obviously the defendants were not going to harm because they thought he was their comrade, was insufficient to show, strictly speaking, that they intended to damage real property over $150. And although, again, the creation of these is not to be excused, but they have been convicted, and they have been punished for that. But the state was still required to show more than. It's kind of like if I possess a little bit of heroin, I possess it and that's a crime, but my intent to sell it requires more, requires more facts. And that's simply not present. In fact, these defendants, the undercover called it a science experiment. They built them, they did. And then they put them aside and went upon their evening. And there's no indication that these defendants would have used them either that night or any other night, much like they didn't use any of the other tools and Chinese shooting stars and bow and arrow that they brought with them. If there's no further questions. Thank you. Thank you. Ms. Sherrill. Chase's claim that the trial court erroneously failed to conduct a fitness hearing is meritless, Your Honors. And its finding of fitness is certainly not an abuse of discretion. Contrary to defendants' claim, no one had any doubts or questions with respect to Chase's sanity at the time of the offense or his mental ability at the time of trial. Defense counsel in the trial court's real concern here was his physical ability to sit through the trial. Counsel requested that Shannon, Dr. Shannon, examine Chase for his physical condition and any cognitive issues that would affect his ability to sit through trial. The court said his real concern was that he was wasting away and that he threw the feces and urine at an officer and that was pretty disturbing conduct. But frankly, it's not surprising. It's common. Defense counsel said to the court, I don't think, quote, I don't think there's going to be any question that cognitively he can understand the nature of the proceedings. At least we don't have any doubt about that. At least the prong of the fitness we have never had a question about or we would have raised it sooner. The state certainly never agreed that he had some kind of mental problem sitting through trial, understanding the proceedings or assisting in his defense. The defendant here is trying to convert the discretionary provision of the statute into a legal finding that a bona fide doubt exists triggering a fitness hearing. That's not the law. Under the statute, the court may order an examination to determine whether a bona fide doubt exists. If no, no hearing is required. The court stated on the record that there was no bona fide doubt of defendant's fitness to stand trial. Now, out of an abundance of caution, defense counsel requested and the trial court allowed examinations by four different doctors, two of whom, Dr. Shannon and Dr. Bernard, were experts in Huntington's disease and worked at Rush University's Huntington's disease division. So as the court noted as well, both doctors who did the behavioral clinical exams were very experienced with the effect of Huntington's disease and they did a battery of tests with respect to it. Defendant here was examined for all physical and mental effects of Huntington's disease, both at the time of trial and at the time of the offense. He was found to be fit to stand trial and sane at the time of the offense, mentally and physically. So defendant's speculative claims that based on things outside of this record, that he was suffering from all these terrible symptoms of Huntington's disease must be rejected. It's not evidence in this record. And many defendants stand trial on medication for their fitness. There's nothing surprising about that. Unless this court has any more questions with respect to the fitness issue, we ask you to reject defendant's claim in that respect. Now, I've already addressed some of the evidence. Even what I've addressed is more than sufficient to support the jury's verdicts in this case. With respect to defendant's claims that the personal property of the officer and burning them, burning their clothes, burning their cars, they also were interested in throwing molotovs at police cars too, which is much more than $600. But officer Ugin testified that his personal vest cost him $600. We all know that they were planning to do this, to throw these molotovs at the cops at the NATO summit when obviously they're all going to be wearing their riot gear and they're going to be burning their riot gear. Now, the fact that they thought Ugin was his friend doesn't have any bearing on that. They're not going to throw it at officer Ugin. They're going to throw it at the officers they had personal vendettas for, the ones that Chase had on his cell phone, the one that Betterly had etched in his mind. So unless this court has any more questions, people ask this court to affirm the defendant's convictions. Thank you, Ms. Sherrill. Ms. Lambros, brief rebuttal. Just briefly as far as the fitness issue, I'm not going to read the transcript into the record. Obviously, this court has that. But counsel is concerned with mental as well as physical fitness for my client at trial. As far as just briefly to kind of sum it up for all three defendants, we realize that a lot of the words that were said are a little bit distasteful and hearing about cops being blown up and that kind of stuff is not what we all want to hear young people being talking about. But it's been said that dissent is the highest form of patriotism. And yes, Church, Chase and Betterly came to protest. And yes, they had ideas and said things that all of us might find jarring. But none of that serves the state's position or salvages its failure to prove that he or any of the others possessed the intent after those devices were created to commit arson. These reasons and those in our brief. Mr. Church, Mr. Chase, Mr. Betterly, thank you for your time and I kindly request that you reverse our client's convictions or grant him a new trial. Thank you very much. Thank you.